# EXHIBIT TO

# CROSS-CLAIM

*EXECUTION COPY*

## EMPLOYMENT AND NON-COMPETITION AGREEMENT

### CHRISTOPHER RADKO

THIS EMPLOYMENT AND NON-COMPETITION AGREEMENT (the "Agreement") is dated as of March 9, 2005 (the "Effective Date"), by and among RAUCH INDUSTRIES, INC. a North Carolina corporation ("Employer" or the "Company"), STARAD INC., a New York Corporation ("Starad") and CHRISTOPHER RADKO, an individual who resides at 26 Cayuga Road, Scarsdale, NY 10583 ("Employee").

WHEREAS, Employer, Starad and Employee have entered into that certain Stock Purchase Agreement dated as of March 9, 2005 (the "Stock Purchase Agreement");

WHEREAS, as a condition to Closing as defined in the Stock Purchase Agreement, the Employer and Employee have agreed to enter into this Agreement; and

WHEREAS, Employer desires to employ Employee, and Employee desires to be employed by Employer, upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Employment and Duties.

(a) Upon the terms and subject to the conditions set forth herein, Employer hereby employs Employee during the Term (as hereinafter defined), and Employee accepts employment with Employer during the Term, to serve as: (i) a member of the Board of Directors of the Company (in which capacity the Employee shall serve for the term of the Agreement or such other term as mutually agreed), and; (ii) President of Starad (and subsequently as President of the Company's Christopher Radko Division, if, when and in such manner the Company decides to incorporate Starad into the operations of the Company). Starad and the Company shall be collectively referred to herein as (the "Employer"). The Employee shall serve in the aforementioned role and office as long as he is a President of Starad and/or Employer. Employee shall hold such other offices and perform such additional duties and responsibilities with Employer which are consistent with the office of President of the Company (or Starad, whichever the case may be), as may be reasonably assigned or delegated to Employee from time to time by the Chief Executive Officer of Employer ("CEO"). Employee shall report directly to the CEO or to any other person designated from time to time by the CEO.

(b) At the direction of the CEO, and, in connection with the action titled "QVC, Inc. v. Starad, Inc. and Christopher Radko Civil Action No. 03-5298" (the "QVC Action"), Employee shall appear on QVC as often as is reasonably requested by the CEO to sell product to help mitigate any amounts claimed pursuant to the QVC Action. Employee shall also use his best efforts to continue to make public appearances and foster celebrity relationships consistent with his past practices.

2. Term. The Term of this Agreement and Employee's employment hereunder (the "Term") shall commence on the Effective Date and shall, unless sooner terminated pursuant to Section 8 herein, terminate on March 7, 2010 (the "Expiration Date"). In the event the Company fails to notify Employee at least ninety (90) days before the Expiration Date that Employer does not intend to renew this Agreement, then subject to Section 8 herein, this Agreement shall automatically renew for further successive terms of twelve months each (the "Renewal Terms"), provided that Employer may terminate the Agreement at the end of any such Renewal Term by notifying Employee of such at least ninety (90) days before the end of the Renewal Term.

3. Exclusive Service. Employee shall devote his exclusive and full time services to the performance of his duties and obligations hereunder during the Term (and any Renewal Terms) and shall not during the Term (or any Renewal Terms) engage in any other activity for gain, profit or pecuniary advantage that is competitive, directly or indirectly, with the Company or Employer, or any of its or their affiliates or subsidiaries, or participate in any other activity that is for gain, profit or pecuniary advantage (even if not thought to directly or indirectly competitive by Employee), unless approved in advance by Employer in writing; provided, however, that, subject to Employee's fiduciary duties and to the restrictions set forth in Sections 10 and 11 hereof, Employee shall not be prohibited from investing his assets in such form or manner as will not require his services in the operation of the affairs or management of the entities in which such investments are made or, in the aggregate, materially detract from the performance by Employee of his duties and obligations hereunder, and Employee may engage in activities involving charitable, educational, religious and similar types of organizations, speaking engagements and similar type activities to the extent that such other activities do not detract from the performance by Employee of his duties and obligations hereunder. Notwithstanding the foregoing, Employee is prohibited from investing his assets or time in any form or manner in any business that competes directly or indirectly with Employer, the Company or any of its or their affiliates or subsidiaries. Employee is not currently engaged in any other business other than in connection with his duties for Starad.

4. Compensation.

(a) Base Salary. As compensation for services rendered to Employer pursuant to this Agreement, Employer shall pay to Employee a base salary (the "Base Salary") at an annual rate of                                                                                      Redacted
                            The Base Salary will be paid bi-weekly in accordance with the standard payroll policies of Employer as from time to time in effect, from which shall be deducted state and federal income taxes, local income or earnings taxes, social security taxes, and such other and similar payroll taxes and charges as may be required or appropriate under applicable law.

2

(b) <u>Bonus Compensation</u>. Provided Employee is still employed, the Employee shall be entitled to a "Targeted Bonus" based upon performance and which will be designed to enable Employee to reasonably be awarded an annual bonus amount targeted at ⟨                    ⟩ Such Targeted Bonus is based upon the performance of Starad or the Christopher Radko Division versus its annual "Division Profit Contribution" Plan, commencing with the Company's fiscal year beginning April 1, 2005. Such Targeted Bonus will be computed as follows:

(i) Employee shall receive ⟨                                                       ⟩ if the annual Actual Net Revenues (as defined below) are at least

(ii) Employee shall receive ⟨                              ⟩ of the Actual Net Revenues (term defined below) computed on an annual basis, <u>if</u> the Employer surpasses the Annual Planned Net Revenues Targeted Amount (term defined below). Notwithstanding the foregoing, the amount paid pursuant to the preceding sentence shall not exceed ⟨                ⟩ annually. "<u>Actual Net Revenues</u>" shall mean the amount of gross revenues generated by the Employer minus discounts, chargebacks, allowances, deductions, discharges and any amounts uncollected from the customer within 180 days of Employer's fiscal year end. "<u>Annual Planned Net Revenues Targeted Amount</u>" shall mean the projected amount of annual Actual Net Revenues which: (1) the CEO and the Employee shall mutually agree upon as a reasonable goal and set in writing prior to the start of each fiscal year during the term of this Agreement; and (2) shall be at least ⟨           ⟩ computed on an annual basis.

(iii) Employee shall receive a percentage (such percentage to be mutually agreed upon by the CEO and the Employee) of the Employer's Actual Net Profit Contribution (term defined below) computed on an annual basis, <u>if</u> the Employer reaches the Annual Planned Net Profit Contribution Amount. Notwithstanding the foregoing, the amount paid pursuant to the preceding sentence shall not exceed ⟨                                ⟩ annually. The "<u>Actual Net Profit Contribution</u>" shall mean the amount of net profit generated by Starad or the Christopher Radko Division of the Company (whichever the case may be) computed on an annual basis, less any bonuses paid to Employee. The "<u>Annual Planned Net Profit Contribution Amount</u>" shall mean the projected annual amount of the Actual Net Profit Contribution which: (1) the CEO and the Employee shall mutually agree upon as a reasonable goal and set in writing prior to the start of each fiscal year during the term of this Agreement; and (2) shall be at least ⟨           ⟩ computed on an annual basis.

(iv) The Targeted Bonus defined in subparagraphs 4(b)(i), 4(b)(ii) and 4(b)(iii) of this Section 4, if awarded pursuant to the terms of such subparagraphs, shall be paid annually within 90 days of the end of the Employer's fiscal year. Notwithstanding the foregoing, the Employer is under no obligation to pay a bonus to Employee in excess of ⟨                    ⟩ unless and until the agreed upon goals for the Annual Planned Net Revenues Targeted Amount and the Annual Planned Net Profit Contribution

3

Redacted

Amount have been satisfied in full and merit such excess payment. The Employer will determine whether the Employee merits such excess Target Bonus payment on an annual basis based upon mutually agreed upon goals and performance targets, however, the awarding of a Target Bonus in excess of or greater than            shall be made in the Employer's sole and absolute discretion.

(c) <u>Additional Compensation</u>. Provided Employee is still employed, and in consideration for the strict compliance with Section 11 of this Agreement, the Employee shall be entitled to additional consideration in the aggregate amount of            (the "<u>Non-Compete Consideration</u>"). the Non-Compete Consideration shall be payable annually during the Term commencing on the first anniversary of the Effective Date and terminating on the fifth anniversary of the Effective Date. The Non-Compete Consideration shall be paid annually within 90 days of the end of the Employer's fiscal year.

5. <u>Equity Purchase</u>. On the date hereof, in accordance with the terms and conditions of the Stock Purchase Agreement, Employee and Employer shall enter into a stock purchase agreement substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Rauch Stock Purchase Agreement</u>"), pursuant to which Employee shall purchase and Employer shall issue approximately            common stock (the "<u>Purchased Shares</u>") for an aggregate purchase price of            ("<u>Share Price</u>"). The pre-money valuation of the Employer, for purposes of valuing the Purchased Shares, is            of the Purchased Shares shall be subject to repurchase and the restrictions on transfer as set forth herein and/or in the Rauch Stock Purchase Agreement. Seller has consented to and Purchaser has authorized CIT to apply, and CIT shall on the Closing Date apply, in consideration for Seller's purchase of the Purchased Shares, the total amount of the Share Price from Seller's cash accounts held by CIT directly to the outstanding obligations currently owing by the Company to CIT.

(a) <u>Employer Repurchase Rights Upon Termination for Cause</u>. If the Employee is terminated for Cause (as defined below) or Disability during the Term or any Renewal Term, or if Employee otherwise voluntarily resigns during the Term or any renewal Term, or if he is employed in any other capacity with an affiliate or related party of the Employer (any such affiliate or related party of the Employer referred to herein, as "<u>Milestone</u>") and is terminated for Cause or Disability by Milestone during the Term or any Renewal Term, or otherwise voluntarily resigns During the Term or any Renewal Term (the Employee being hereinafter referred to as a "<u>Departing Shareholder</u>" and any such date of termination being hereinafter referred to as a "<u>Termination Date</u>"), then, the Employer, or Milestone (as applicable), at any time after such Termination Date, shall have, subject to any restrictions contained in the Credit Agreement (as defined below), the right to purchase, and the Employee shall be required to sell to the Employer, his Purchased Shares at a price per share equal to the lesser of: (i) the then Fair Market Value (as defined below); or (ii) the purchase price per share paid by the Employee set forth in the Rauch Stock Purchase Agreement (the "<u>Purchase Price</u>").

(b) <u>Repurchase Rights Upon Termination Without Cause</u>. In the event the Employer or Milestone terminates the employment or affiliation of the Employee with the Employer or

4

Redacted

Milestone, without Cause then:

(i) The Employee may, for a period of ten (10) days following the date of such termination, require, in writing, but subject to any restrictions contained in the Credit Agreement, the Employer to repurchase the Employee's Purchased Shares at a price per share equal to the "Repurchase Price." The "Repurchase Price" shall be (i) the Purchase Price, if the Employee is terminated without Cause during the first year of his employment with the Employer, or affiliation with Milestone or (ii) if the Employee's employment with the Employer, or affiliation with Milestone is terminated without Cause after the first anniversary of the Effective Date, the Fair Market Value (defined below). Any payment required to be made by Employer in accordance with this Section shall be made within 60 days following receipt of Employee's notice, subject to any restrictions contained in the Credit Agreement preventing such payment.

(ii) The Employer may, for a period of 365 days following the Termination Date, require, subject to any restrictions contained in the Credit Agreement, the Employee to sell the Purchased Shares at a price per share equal to the Repurchase Price (as defined in (b)(i) above).

(c) For purposes of this Section 5, the following definitions apply:

(i) "Fair Market Value" of a share for any purposes on a particular date shall be the most recent Cash Flow Value per share (defined below) as calculated by the Board of Directors of the Employer from time to time and as adjusted in good faith by the Board of Directors.

(ii) "Credit Agreement" means that certain Revolving Credit and Security Agreement dated as of April 12th, 2004 entered into by and among PNC Bank, National Association as lender and agent, the Employer as borrower, and any replacement or substitute loan agreement(s) executed by the Employer in connection with any refinancing of the indebtedness outstanding under the Credit Agreement.

(iii) "Cash Flow Value per share" means the total of the Employer's (i) trailing twelve months of EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization), multiplied by a market multiple determined in the sole discretion of the Employer's Board of Directors (including a reasonable and customary private company liquidity discount), less total outstanding indebtedness (as determined by the Board including average annual revolving credit facility balances), divided by (ii) the then outstanding shares of common stock of the Employer.

6. Expense Reimbursement. Employee's duties under this Agreement may require a reasonable amount of travel and the incurrence of travel and other business expenses. Employer shall pay or reimburse Employee for all reasonable out-of-pocket expenses incurred or paid by the Employee in the course of his duties hereunder upon presentation of expense statements or vouchers and such other information as Employer may reasonably require. Employee shall

5

comply with reasonable budget limitations commensurate with Employee's position with Employer and such approval and reporting requirements with respect to expenses as Employer may establish from time to time. Employer hereby acknowledges and agrees that due to Employee's position in the Company, that Employee shall be entitled to business class travel on all Company-related international travel and domestic Company-related travel over 2 hours and business class hotel accommodations.

7. <u>Other Benefits</u>. During his employment under this Agreement, Employee shall be entitled to: (i) four (4) weeks paid vacation annually, holidays and sick leave as are consistent with Employer's standard policies for a person holding Employee's position and tenure with Employer; (ii) participate in such Employer-provided group health, dental, disability, and life insurance programs as such programs may be from time to time implemented, modified or maintained and made available in the sole discretion of Employer for a person holding Employee's position and tenure with Employer; and (iii) the use of a Company-owned car during the Term.

8. <u>Early Termination of Term of Agreement; Effect of Termination</u>.

(a) The Term (or any Renewal Term) and the employment of Employee hereunder shall terminate (a "<u>Termination</u>") in any of the following circumstances:

(i) immediately, if Employee dies; or

(ii) immediately, if Employee receives benefits under the long-term disability insurance coverage then provided by Employer or, if no such insurance is in effect, upon Employee's "Disability" (as such term is hereinafter defined); or

(iii) at the option of Employer for "<u>Cause</u>" (as such term is hereinafter defined) upon Employer providing written notice to Employee of the basis of such Termination; or

(iv) by Employer at any time for any reason other than "Cause" upon sixty (60) days' prior written notice to Employee, <u>provided, however</u> that Employer shall not terminate Employee, other than for Cause, during the first two years of the Term; or

(v) by Employee at any time upon ninety (90) days' prior written notice to Employer.

(b) Upon the occurrence of a Termination for any reason or upon the end of the Term or any Renewal Term, whichever comes first, all rights and obligations under this Agreement shall cease except for Employer's obligations under Sections 9 and 17 herein and Employee's obligations under Sections 10, 11 and 12 herein. The parties acknowledge and agree that Sections 9, 10, 11, 12 and 17 herein shall survive the termination of Employee's employment hereunder.

(c) For purposes of this Agreement, "<u>Cause</u>" means that the Employee: (i) has been convicted of or pled guilty to, in a court of competent jurisdiction, an act constituting a

6

misdemeanor involving moral turpitude or a felony under the laws of the United States or any state or political subdivision thereof or any other jurisdiction; (ii) has committed an act constituting a breach of fiduciary duty, gross negligence or willful misconduct with regard to the performance of his duties as an Employee of the Company; (iii) has engaged in conduct which violates the Company's then existing internal policies or procedures and which is materially detrimental to the business, reputation, character or standing of the Company or any of its affiliates; (iv) has committed an act of fraud, dishonesty or misrepresentation that is materially detrimental to the business, reputation, character or standing of the Company or any of its affiliates; (v) has engaged in self-dealing; (vi) has materially breached his obligations as set forth in this Agreement, the Stock Purchase Agreement or the Rauch Stock Purchase Agreement and such breach has not been cured within 30 days of receipt of written notice from Employer of such breach; (vii) has materially neglected or failed to satisfactorily perform his duties and responsibilities as an employee and executive of the Employer; (viii) has become bankrupt or insolvent; or (ix) has been repeatedly or continuously absent from the Employer without the permission of the immediate supervisor or Board of Directors, as deemed appropriate.

(d)    For purposes of this Agreement, "Disability" means Employee's inability to render, for a period of 180 days during any 365-day period, services hereunder by reason of permanent disability as shall be determined in good faith by the Board of Directors.

9.    Severance Benefits.

(a)    If Employee's employment is terminated pursuant to Section 8(a)(iii) or Section 8(a)(v), then Employee (or his estate as applicable) shall only be entitled to receive upon termination: (i) provided and for so long as Employee qualifies for COBRA group health plan continuation coverage, continuation coverage under Employer's group health plan for a period of up to eighteen months under the premium payment terms existing as of the Termination; (ii) payment of any expense reimbursements under Section 6 hereof for expenses incurred in the performance of his duties hereunder prior to such Termination; and (iii) payment of the unpaid portion, if any, of the Base Salary attributable to the period ending on the effective date of such Termination.

(b)    If Employee's employment is terminated pursuant to Section 8(a)(iv) prior to the third anniversary of the Effective Date, Employee shall receive a severance payment equal to ⬛ and, if terminated pursuant to Section 8(a)(iv) subsequent to the third anniversary of the Effective Date, Employee shall receive a severance payment equal to ⬛ Employee shall also receive payment of any expense reimbursements under Section 6 hereof for expenses incurred in the performance of his duties hereunder prior to such Termination.

(c)    If Employee's employment is terminated for any other reason other than those enumerated in Section 9(a) or 9(b) herein above, then Employee shall only be entitled to receive upon such Termination, the following compensation: (i) payment of the unpaid portion, if any, of the Base Salary attributable to the period ending on the effective date of such Termination; and (ii) payment of any expense reimbursements under Section 6 hereof for expenses incurred in the performance of his duties hereunder prior to such Termination. Except as otherwise set forth

7

Redacted