in this Section 9, Employee shall not be entitled to any severance or other compensation of any kind after any Termination.

(d) Notwithstanding any provision of Sections 9(a), (b) or (c) herein, upon Employee's Termination for any reason, Employee will be entitled to (i) any employee benefits that have by their express written terms become vested (unless otherwise provided in any such benefit plan or agreement); and (ii) continue his group health plan benefits to the extent required by COBRA, but otherwise shall have no right to continue participating in any of Employer's benefit programs or plans.

10. Business Interests and Obligations.

(a) Definitions. The following definitions are used herein:

(1) As used herein, the term "Company Information" means information, knowledge or data that was disclosed to or known by Employee as a consequence of or through Employee's employment with the Company prior to the Effective Date, or Employee's employment hereunder, or through any other relationship between Employee and Employer or with Employer's subsidiaries, affiliates, successors or assigns (including, without limitation, any information conceived or developed by Employee), about:

　　(i) Employer's or any of its subsidiaries', affiliates', successors' or assigns' activities, services, products, computer programs, systems, registrations, trademark applications, registrations, licenses, trade secrets, patent applications, copyrights, formulas, designs, patterns, methods, machines, manufacturers, compositions, inventions, discoveries, customer records, processes, information relating to research, development, inventions, work performed or to be performed for Customers (as such term is hereinafter defined), contractual agreements, lists of past, current or prospective Customers, lists of employees and salary information, marketing plans, strategies, and forecasts;

　　(ii) Customer's activities, plans, products, processes and services including, without limitation, information relating to business operations, employee relations, finance, and product or service marketing;

　　(iii) Vendor's (as such term is hereinafter defined) activities, plans, services, products and processes including, without limitation, information relating to business operations, employee relations, finance, and product or service marketing; and

　　(iv) All information which Employee has a reasonable basis to know was created, modified or used and held secret by Employer or any of its subsidiaries, affiliates, successors or assigns or that was accepted by Employer or any of its subsidiaries, affiliates, successors or assigns from any third party under an obligation of confidentiality or otherwise.

8

As used herein, the term "Customer" means any person or entity and their predecessors or successor-in-interest for whom Employer, or any of Employer's subsidiaries or affiliates, provided or provides services on or prior to the effective date of any Termination or to whom Employer or any of its subsidiaries, affiliates, successors or assigns provided or provides a product on or prior to the effective date of Termination.

As used herein, the term "Vendor" means any third party (or their predecessors or successors or assigns) selling or licensing a product or service to a Customer or to Employer or any of its subsidiaries or affiliates on or prior to the effective date of any Termination. Gevity HR, Inc. and any employment agencies shall be considered Vendors.

(2) "Trade Secrets" means any technical information and business information including, without limitation, all Company Information, that generally facilitates the sale of products, increases revenues, or provides an advantage over the competition (hereinafter referred to collectively as "Company Information") and is not generally known, and is identified as such.

(3) "Know-How" means all factual knowledge and information related to the Company's business which is not capable of precise, separate description but which, in accumulated form, after being acquired as a result of trial and error, gives to the one acquiring it the ability to produce and market something which one would otherwise not have known how to produce and market with the same accuracy or precision necessary for commercial success, provided, however, that such knowledge and information is not in the public domain or readily available to any third party other than a limited number of persons who have agreed to keep that information secret.

(4) "Confidential Information" is any Company Information acquired by Employee in the course and scope of his/her activities for the Company that is designated by the Company as "confidential" or that the Company indicates through its policies, procedures, or other instructions should not be disclosed to anyone outside the Company expect through controlled means. Confidential Information need not be a Trade Secret, Proprietary Information or Know-How to be protected under this Agreement. The parties specifically agree that, regardless of its affect on trade secret status, the controlled and limited disclosure of Confidential Information to third parties for legitimate business purposes and availability of the Confidential Information to others outside the Company through independent investigation and effort will not remove it from protected status as Confidential Information under this Agreement if Employee was first entrusted with the Confidential Information while employed with the Company.

(5) "Intellectual Property" means all compositions, articles of manufacture, processes, apparatus (collectively the "Inventions"); data, writings and other works of authorship (including, without limitation, software, protocols, program codes, audiovisual effects created by program code, and documentation related thereto, drawings); mask works; and certain tangible items (including, without limitation, materials, samples, components, tools, and operating devices, e.g., board assemblies, and engineering models).

(6) "Intellectual Property Rights" means patents, trademarks, copyrights, mask rights, Trade Secrets, Proprietary Rights and Know-How covering the Intellectual Property.

9

(b)  Protection of Confidential Information.

(1)  Employee covenants and agrees that he shall not, at any time during or after the Term, disclose any Confidential Information to any person or entity, except in the course of Employee's duties on behalf of Employer, and shall not use any Confidential Information for the benefit of anyone or any entity other than Employer.

(2)  Employee covenants and agrees that he shall not, during or after the Term (i) use or disclose to other shareholders, officers, directors, partners, affiliates and employees of Employer any confidential or proprietary information belonging to Employee's former employers, former business associates or other third parties unless written permission has been given by such third parties to Employer to allow Employer to use and/or disclose such information; and (ii) receive from persons not employed by Employer any confidential or proprietary information not belonging to Employer unless a valid agreement is authorized by Employer and is signed by Employer and the disclosing party. Employee shall not use any of the Confidential Information to the detriment of Employer or Employer's affiliates or subsidiaries.

(3)  Employee agrees that he shall leave with or return to Employer all documents, records, notebooks, or any other repositories of any Confidential Information, including any copies thereof that are then or later discovered to be in Employee's possession, whether such were developed or prepared by Employee or by others.

(4)  The obligations of Employee pursuant to this Section 10 shall be in effect during and after the Term and any Renewal Term and shall survive and continue after the effective date of any termination of Employee's employment hereunder.

(c)  Intellectual Property. Employee agrees that he/she will promptly inform and disclose to the Company all Intellectual Property created or developed during the course of employment with the Company. Employee hereby agrees and acknowledges that all such Intellectual Property shall be the exclusive property of the Company unless otherwise agreed by both parties in writing. During employment and as necessary thereafter, Employee shall assist the Company to obtain, perfect, maintain, and enforce all Intellectual Property Rights covering such Intellectual Property that the Company seeks to protect, and shall execute all documents and do all things necessary to secure the Intellectual Property for the complete benefit of the Company. Employee hereby assigns to the Company or its designee all right, title, and interest to all Intellectual Property and Intellectual Property Rights covered by the foregoing that Employee may now own or may own at any time during employment with the Company.

(d)  Prior Works/Rights. Employee hereby represents and acknowledges that no works relating to or incorporating any Intellectual Property or covered by Intellectual Property Rights, as defined herein, existed prior to the Effective Date that are owned by Employee or licensable to the Company by Employee, or in which Employee has any other interest (collectively the "Prior Works") that have not been assigned or licensed to the Company. If such Prior Works are incorporated into the Company's products or processes contrary to this representation so that the Company is not able to use the Prior Works as contemplated by the Company without infringing such Intellectual Property Rights, Employee hereby grants a non-

10

exclusive, royalty-free, irrevocable, perpetual, worldwide license to the Company to make, have made, use, sell, offer to sell, import or otherwise commercially exploit such Prior Works, and any Intellectual Property Rights that cover or are embodied by such Prior Works, as part of or in connection with the Company's products or processes.

11. <u>Restrictive Covenants</u>.

(a) <u>Customer Restriction</u>. For so long as the Employee is employed by Employer and continuing for five (5) years after Termination of employment with the Employer or any of its affiliates or subsidiaries, Employee covenants and agrees that he shall not, working alone or in conjunction with one or more other persons or entities, for compensation or not, (i) provide or offer to any manufacturer (including, without limitation, Northstar), distributor (including, without limitation, Arcadia), Customer or Vendor any products or services which are the same as or are sold in competition with those offered by Employer or any of its affiliate or subsidiaries prior to the Effective Date or by Employer or any of its affiliates or subsidiaries during the Term or any Renewal Term, or (ii) induce or attempt to induce any Customer, manufacturer (including, without limitation, Northstar), distributor (including without limitation Arcadia), or Vendor to withdraw, curtail or cancel its business with Employer or any of its affiliates or subsidiaries or in any manner modify or fail to enter into any actual or potential business relationship with Employer or any of its affiliates or subsidiaries.

(b) <u>Non-Raid</u>. For so long as the Employee is employed by Employer and continuing for five (5) years after Termination of employment with the Employer or any of its affiliates or subsidiaries, Employee covenants and agrees that he shall not, working alone or in conjunction with one or more other persons or entities, for compensation or not, (i) recruit or otherwise solicit or induce any person or entity who is an employee, officer, director, consultant, Vendor, manufacturer (including, without limitation, Northstar), distributor (including, without limitation, Arcadia), or Customer of Employer (or any employee, officer or director of a Vendor or Customer) or any of its or their affiliates or subsidiaries, to terminate their employment with, or otherwise cease their relationship with, Employer or any of its or their affiliates or subsidiaries, or (ii) hire, recruit or otherwise solicit any person or entity who had been an employee, officer, director, consultant, manufacturer (including, without limitation, Northstar), distributor (including, without limitation, Arcadia), or Customer of Employer (or employee, officer or director of a Vendor or Customer) of Employer or any of its or their affiliates or subsidiaries who had been an employee, officer, director, manufacturer, distributor, consultant, Vendor or Customer of Employer (or employee, officer or director of a Vendor or Customer) or of any of its or their affiliates or subsidiaries.

(c) <u>Noncompetition</u>. In consideration for the compensation set forth in Section 4 and further due to the unique and significant degree to which Employer's business and good will is tied into and associated with the name of Employee, such that Employer's business and good will would be significantly damaged if Employee were to compete with the business of Employer, so long as the Employee is employed by Employer and continuing for four (4) years after Termination of employment with the Employer or any of its affiliates or subsidiaries, Employee covenants and agrees that he shall not, working alone or in conjunction with one or more other persons or entities, for compensation or not, permit his name to be used by or engage in or carry on, directly or indirectly, either for himself or as a member of a partnership or other

11

entity or as a stockholder, investor, officer or director of a corporation (other than Employer and/or any of its affiliates or subsidiaries) or as an employee, agent, officer, consultant, director, associate or contractor of any person, partnership, corporation or other entity (other than Employer and/or any of its affiliates or subsidiaries), any business in competition with the business of Employer or any of its affiliates or subsidiaries as such business is conducted or proposed to be conducted prior to or during the Term or any Renewal Term of this Agreement, including but not limited to the business of designing, manufacturing, importing, marketing, selling and distributing seasonal and Christmas products, giftware, collectible items, table top items, clothing, home décor and related products in any location in which Employer or any of its affiliates or subsidiaries conducts such business.

(d) *Reformation*. If, in any judicial proceeding, the court shall refuse to enforce any of the separate covenants contained in Section 11(a), 11(b) or 11(c) hereof because the time limit is too long, it is expressly understood and agreed between Employer and Employee that for purposes of such proceeding such time limitation shall be deemed reduced to the extent necessary to permit enforcement of such covenants. If, in any judicial proceeding, the court shall refuse to enforce any of the separate covenants contained in Section 11(a), 11(b) or 11(c) hereof because they are more extensive (whether as to geographic area, scope of business or otherwise) than necessary to protect the business and goodwill of Employer and/or any of its subsidiaries or affiliates, it is expressly understood and agreed between Employer and Employee that for purposes of such proceeding the geographic area, scope of business or other aspect shall be deemed reduced to the extent necessary to permit enforcement of such covenants.

12. *Injunctive Relief*. Employee acknowledges that a breach of Section 3, 10 or 11 hereof would cause irreparable damage to Employer, and in the event of Employee's breach of the provisions of Section 3, 10 or 11 hereof, Employer shall be entitled to a temporary restraining order and an injunction restraining Employee from breaching such covenants without the necessity of posting bond or proving irreparable harm, such being conclusively admitted by Employee. Nothing shall be construed as prohibiting Employer from pursuing any other available remedies for such breach, including the recovery of damages from Employee. Employee acknowledges that the restrictions set forth in Sections 3, 10 and 11 hereof are reasonable in scope and duration and are necessary to protect Employer's legitimate business interests, given the nature of the business of Employer. Employee agrees that the provisions of Section 3, 10 and 11 hereof and/or the issuance of an injunction restraining Employee from breaching such covenants in accordance with their terms will not pose an unreasonable restriction on Employee's ability to earn a living, pursue his occupation or obtain employment or other work following the effective date of any Termination.

13. *Other Agreements*. The provisions of Sections 3, 10 and 11 hereof shall be independent of and in addition to any other agreement between Employee and Employer or its subsidiaries or affiliates regarding the subject matter of Sections 3, 10 and 11 hereof.

14. *Entire Agreement*. This Agreement is the entire agreement between the parties hereto with respect to the subject matter hereof and shall not be amended, altered, or modified in any manner whatsoever, except by a written instrument executed by the parties hereto. This Agreement supersedes all prior agreements between Employer and Employee with respect to the

12

subject matter hereof and all such prior agreements shall be void and of no further force or effect as of the Effective Date.

15. <u>Waiver</u>. The waiver by any party hereto of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach.

16. <u>Governing Law</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE INTERPRETED, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NORTH CAROLINA.

17. <u>Indemnity</u>. Employee shall be entitled to indemnification from Employer with respect to his services for Employer and his acts or decisions in connection therewith as may be available to Employee as a matter of law, as provided in Employer's Articles of Incorporation, By-laws, or as may be provided in a resolution approved by Employer's Board of Directors, provided that such indemnification obligations provided herein shall not extend to any events which constitute willful misconduct, fraud or gross negligence.

18. <u>Assignability</u>. Employee shall not, without the prior written consent of Employer, assign, transfer, or otherwise convey this Agreement or any right or interest herein. This Agreement and all rights and obligations of Employer or any of its successors may be assigned or otherwise transferred to any of its successors and shall be binding upon and inure to the benefit of its successors. As used herein, the term "successor" shall mean any person, corporation or other entity that, by merger, consolidation, purchase of stock, assets, liquidation, voluntary or involuntary assignment, or otherwise, acquires all or a substantial part of the assets of Employer or succeeds to one or more lines of business of Employer.

20. <u>Interpretation</u>. The parties hereto acknowledge and agree that each party and its counsel has reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision and that the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement.

21. <u>Notices</u>. All notices hereunder shall be in writing, shall be delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested, or by express or other delivery service, if to Employee, to his attention at the address set forth below and, if to Employer, to the attention of the Chairman of the Board of Directors at the address set forth below. All notices hereunder shall be deemed effective when received as set forth above. No notice shall be effective if given otherwise than as provided herein.

*[SIGNATURES APPEAR ON FOLLOWING PAGE]*

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the Effective Date.

EMPLOYER:

RAUCH INDUSTRIES, INC.
a North Carolina corporation

By: *[signature]*
Steven R. Huffn
Its: President and Chief Executive Officer

*Address:*
2408 Forbes Road
Gastonia, North Carolina 28056


STARAD INC.
a New York corporation

By: *[signature]*
Christopher Radko
Its: President and Chief Executive Officer

*Address:*
500 Saw Mill River Road
Elmsford, NY 10523

EMPLOYEE:

*[signature]*
Christopher Radko

*Address:*
26 Cayuga Road
Scarsdale, NY 10583

14

3845950v6